Filed 9/8/20 (review denied 12/30/20; reposted to include Supreme Court statement upon denial of review)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.E., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> J.E., <br><br>     Defendant and Appellant. | A156839 <br><br> (Contra Costa County <br> Super. Ct. No. J1900105) |

    J.E. appeals from an order of the juvenile court declaring her a ward and placing her on probation. (Welf. & Inst. Code, § 602.) The court found J.E. committed two misdemeanor violations of the Penal Code, battery on a peace officer (§ 242/243, subd. (b)), and resisting, obstructing or delaying a peace officer (§ 148, subd. (a)(1)). J.E. argues there is insufficient evidence in the record to establish she appreciated the wrongfulness of her conduct, as required for minors under the age of 14. (Pen. Code, § 26.) We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

    On January 27, 2019, at approximately 12:45 p.m., two sheriff deputies responded to a domestic violence report at a home where J.E. lived with her mother, A.R. A.R. was crying and had a small amount of blood under her nose. She told the deputies she and J.E. had an argument about cleaning the

1

house.  During the argument, A.R. "shoved" J.E., and J.E. hit A.R. "a couple times" in the face.  J.E. then left the house and A.R. did not know where she was.  A.R. signed a citizen's arrest form for battery and provided a physical description of J.E.  While interviewing A.R., the deputies saw J.E. down the street and left by car to speak with her.

J.E. was walking on the sidewalk with a friend.  The deputies exited their marked patrol car, called to J.E. by name, and identified themselves.  The deputies told J.E. they needed to escort her back home to talk with her mother and "figure out" how to handle the situation.  The deputies told J.E. she was not under arrest, but she needed to come with them.

J.E. refused to go with the deputies, stating, "F you.  I'm not going to go with you guys," and began walking away.  The deputies followed J.E. and told her "five or six" times to stop walking.  J.E. ignored the commands.  One of the deputies then grabbed one of J.E.'s arms and the other deputy grabbed her other arm, with one deputy stating, "We're going to escort you home."  J.E. began "twisting and turning" and "flailing her legs" as the deputies attempted to bring her to the patrol car.  The deputies then handcuffed her.  As the deputies were bringing J.E. back to the patrol car, J.E. spit at the deputies and kicked a different vehicle, causing a dent.  The deputies then placed J.E. in the back of the patrol car.  Once there, J.E. kicked one of the deputies in the stomach.  The deputy "was able to pull back, so it . . . didn't impact [her] stomach forcefully."

The deputies drove to J.E.'s house, where A.R. was waiting out front.  The officers allowed A.R. to come up to the vehicle to speak with J.E.  After speaking with A.R. briefly, J.E. told the deputies, "I'm done.  Can you please have my mom leave."  A.R. then yelled at J.E., "I hope you die.  I hope they beat your ass in there.  I hope they never let you out."  A deputy then asked

2

A.R. to step away from the patrol car, and A.R. replied, "F you, B." The deputies asked a bystander to remove A.R. from the area and took J.E. to juvenile hall.

On January 29, 2019, the Contra Costa County District Attorney's Office filed a juvenile wardship petition alleging J.E. committed misdemeanor battery upon a peace officer and misdemeanor resisting, obstructing, or delaying a peace officer.

A detention hearing was held on January 30, 2019. At the hearing, the Probation Department submitted an initial case assessment. A.R. had reported that there were prior incidents when J.E. hit her with a hanger and threatened to kill her. According to A.R., J.E rarely followed her commands and consistently skipped school. A.R. quit her job because J.E.'s behavior had "become out of control." A review of J.E.'s school records showed J.E. was suspended twice for being physically aggressive and making threats towards staff, and was disciplined on several occasions for unexcused absences, disrupting class, using profanity, and being under the influence of marijuana.

At the detention hearing, J.E.'s counsel requested that she be released to A.R., who had agreed to have her daughter come home with an ankle monitor. The probation officer and the People opposed this request and recommended that J.E. be detained, based on evidence that she had been disrespectful to her mother, school staff and police officers, and that she had punched A.R. during the most recent incident. The court followed the probation officer's recommendation, citing concerns about J.E. and A.R.'s volatile relationship and A.R.'s safety if J.E. were allowed back home.

A contested jurisdictional hearing was held on February 26, 2019. The People elicited testimony about the incident from A.R. and one of the arresting deputies. A.R. also testified about her relationship with her

3

daughter. J.E. was 11 when she began living with A.R., before which she lived with her grandmother. A.R. stated she never taught J.E. the difference between right and wrong. She also denied teaching J.E. that it was wrong to hit somebody, testifying that she "told her to stand up for herself." A.R. testified further that she never taught J.E. how to interact with police officers or to respect the commands of police officers.

After the witnesses completed their testimony, J.E. moved to dismiss the wardship petition, arguing the prosecution failed to establish that she had the requisite capacity to commit the alleged crimes. The court denied the motion, finding J.E. understood the wrongfulness of her conduct. The court also sustained the wardship petition, finding J.E. committed the alleged offenses.

At a dispositional hearing on March 19, 2019, J.E. was declared a ward of the court and was placed on probation.

## DISCUSSION

J.E. contends there is insufficient evidence to support the juvenile court's jurisdictional findings. J.E. does not dispute that she resisted an officer and committed battery on an officer, but she argues that this conduct was not unlawful because she did not understand that it was wrong.

Penal Code section 26, which applies in juvenile wardship proceedings, creates a presumption that a child under the age of 14 is incapable of committing a crime. (*In re Gladys R.* (1970) 1 Cal.3d 855, 863 (*Gladys R.*).) To overcome this presumption, the prosecution must show by clear and convincing evidence that the child understood the wrongfulness of the charged act at the time of its commission. (Pen. Code, § 26; *In re Manuel L.* (1994) 7 Cal.4th 229, 232; *People v. Cottone* (2013) 57 Cal.4th 269, 280.) Penal Code section 26 "embodies a venerable truth . . . that a young child

4

cannot be held to the same standard of criminal responsibility as his [or her] more experienced elders." (*Gladys R.*, *supra*, 1 Cal.3d at p. 864.)

On appeal, we review the juvenile court's ruling under Penal Code section 26 to determine if it is supported by substantial evidence. (*In re Marven C.* (1995) 33 Cal.App.4th 482, 486 (*Marven C.*).) Substantial evidence is "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Under this standard "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) "[T]he trial court's ruling must be upheld if there is any basis in the record to sustain it." (*People v. Marquez* (1992) 1 Cal.4th 553, 578.)

Courts consider the age, experience, knowledge and conduct of a minor to determine whether she understood the wrongfulness of her conduct. (*Gladys R.*, *supra*, 1 Cal.3d at p. 867.) Knowledge of wrongfulness cannot be inferred from the offense itself, but the court may consider "the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment." (*In re Tony C.* (1978) 21 Cal.3d 888, 900 (*Tony C.*).) The closer a child is to the age of 14, the more likely she is to appreciate the wrongfulness of her conduct. (*In re Paul C.* (1990) 221 Cal. App.3d 43, 53 (*Paul C.*); *Marven C.*, *supra*, 33 Cal.App.4th at p. 487.)

Applying these standards, we conclude that substantial evidence supports the trial court's finding that J.E. knew her conduct was wrongful. J.E. was less than a month from her fourteenth birthday at the time of the incident. When a child is so close to 14, it is more likely she understood the wrongfulness of her conduct. (See *Paul C.*, *supra*, 221 Cal. App. 3d at p. 52; *Marven C.*, *supra*, 33 Cal.App.4th at p. 487.) And we find no evidence of any impairment that might indicate J.E. has a diminished social or mental capacity for her age. (Compare *Gladys R.*, *supra*, 1 Cal.3d at p. 867 [12-year-old girl had "the social and mental age of a 7-year-old."].)

The circumstances surrounding J.E.'s current offenses also provide some evidence that J.E. understood her conduct was wrong. The deputies were in uniform, in a marked patrol car, and identified themselves as deputies when they first contacted J.E. and told her she needed to accompany them. J.E. told the deputies she was "not going to go with you guys," and ignored them telling her to stop walking away. Her words show J.E. understood what was being asked of her and made a conscious choice to resist the deputies, and her resistance was not fleeting or equivocal, but grew as the encounter continued. Even after J.E. was forcibly detained, she continued to resist by kicking at the officers, spitting at them and, ultimately, kicking one officer in the stomach. This is conduct that, whether it is aimed at a peace officer or anyone else, most 13-year-olds know is wrong.

But the capacity determination requires a trial court to consider the particular circumstances and perspective of the individual child before it, rather than to rely on generalizations about what children of a certain age should know. The evidence in this case is that the only parent who may have been a fixture in J.E.'s life did not teach her to respect authority figures or to expect fair treatment from them. Witness, for example, the way J.E.'s

6

mother lashed out when J.E. told the police she was finished speaking with her mother from the back of the police car. This evidence does not defeat the trial court's capacity determination because J.E.'s mother was not her only moral guide. J.E. lived with her grandmother until the age of 11, and likely there learned right from wrong, as A.R. testified that J.E. was basically a good kid. Also, the probation department's initial case assessment contains evidence that J.E. had been taught—by her school if not at home—that it is wrong to disobey and physically assault authority figures. The assessment reveals that J.E. had a substantial history of disrespecting and being physically aggressive toward authority figures *and* of being disciplined for this conduct. Combining this evidence specific to J.E.'s circumstances with evidence from the incident itself, we conclude there is substantial evidence supporting the trial court's determination that J.E. understood at least some of her conduct to be wrongful.

J.E. argues she did not understand she was required to obey the deputies because they told her she was not under arrest. But if J.E. understood the concept of being arrested she necessarily understood the officers' authority over her. As the juvenile court explained at the contested jurisdiction hearing, the officers clearly communicated to J.E. that she was required to accompany them back to her home so that they could resolve her mother's complaint against her. And even if J.E.'s initial failure to accompany the deputies could be excused on the basis she did not understand this obligation, her later acts of kicking and spitting at the deputies were also acts obstructing a peace officer in the performance of his or her duty, and these later, more aggressive acts provided a sufficient basis for both of the charges against J.E. Any confusion as to whether she needed to accompany

7

the deputies would not have excused the violent behavior after she was detained.

J.E. contends that A.R.'s testimony compels the conclusion that J.E. did not know her conduct was wrong. We disagree. A.R. did not testify that J.E. does not understand that it is wrong to disrespect, disobey, or strike out physically against a police officer, but only that A.R. did not teach her daughter these lessons. But J.E. lived with her grandmother until she was 11, and nothing in the record indicates that J.E.'s grandmother failed to teach her right from wrong. Moreover, J.E. was in eighth grade at the time of the incident, and part of going to school is learning to respect other people, including teachers and other authority figures. Evidence that J.E. was disciplined at school for her disrespectful and violent conduct shows that she was taught she should respect the commands of authority figures, even if her mother never imparted these lessons.

J.E. argues her kicking was a "self-preservation impulse" because she was confused why the deputies were arresting her and fearful of returning home to a "volatile situation." Evidence that J.E. may have been afraid of her mother does not further her argument that she did not know her actions against the officers were wrongful. We find no evidence that J.E. expressed a fear of the officers, and the circumstances surrounding the encounter give us no reason to believe J.E. was made to feel afraid. Nor do we find any indication in the evidence or testimony that J.E.'s spitting and kicking at the officers was an involuntary impulse or an act of self-defense.

J.E. contends that the circumstances surrounding her offenses do not support an inference that she knew her conduct was wrongful because she did not plan to commit a crime or attempt to cover up criminal conduct, but simply acted out of "instinct and fear." As support for this argument, J.E.

8

relies on a line of cases in which the minor's knowledge of wrongfulness was established with evidence of the minor's significant preparation for and/or concealment of criminal conduct. (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 540 [minor understood wrongfulness of shooting his father because he had secretly taken the gun and then hid it after the shooting]; *Tony C.*, *supra*, 21 Cal.3d at pp. 900–901 [minor repeatedly threatened woman with deadly force and took her to secluded location before he raped her]; *People v. Lewis* (2001) 26 Cal.4th 334, 379 [minor knew arson was wrongful because he fled crime scene and gave conflicting statements to detectives about the incident].)

J.E.'s authority is inapposite; the fact that J.E.'s offenses did not involve preparation, or a cover-up, does not mean she failed to comprehend what she did was wrong. Nor do the circumstances surrounding J.E.'s interaction with the deputies compel the conclusion that she acted out of instinct and fear or, even if those were her motivations, that she did not understand her conduct was wrong. J.E. was almost 14 years old when two deputies clearly communicated to her that she needed to accompany them because of the physical altercation that she had just had with her mother. Without expressing fear or confusion, J.E. responded to the officers with verbal profanity, physical resistance and, ultimately, physical violence. These circumstances support the trial court's finding that J.E. understood the wrongfulness of her actions.

We understand that the deputies intervened at a moment when J.E. was angry, upset, and in no mood to cooperate, and that because she is still a child her ability to regulate her emotions remains underdeveloped. But none of that gives her the right to resist lawful authority or to kick a peace officer who was lawfully doing her job. We conclude there is substantial evidence to

9

support the trial court's finding that J.E. knew it was wrong to strike out in this manner.

## DISPOSITION

The judgment is affirmed.

_____

TUCHER, J.

I CONCUR:


_____

POLLAK, P. J.


*People v. J.E.* (A156839)

11

STREETER, J., Concurring and Dissenting.

While I concur in one narrow aspect of my colleagues' reasoning, I must respectfully dissent from most of their opinion and from their disposition.

## I. Background

The majority opinion sketches out the events preceding J.E.'s arrest accurately, but omits some of the details surrounding the domestic violence report from A.R. that brought Sheriff's Deputies Slater and Spangler to the scene. Perhaps most importantly, A.R., in her testimony at the contested jurisdictional hearing, made it clear that she started the physical fight with J.E. And when asked why she "call[ed] the police" after the altercation with J.E., A.R. replied "to scare her."

"Scare her," she did. The two deputies, upon spotting J.E. a few blocks from A.R.'s apartment, tried to question her. J.E., who had no previous experience in any encounter with law enforcement officers, tried to walk away, but the deputies insisted she come along with them. J.E. protested, and tried to twist away as she was being led by the arm to a patrol car, kicking and screaming.

The deputies handcuffed J.E., and dragging her by the arms, forced her into the back of their patrol car. While they were "scooting" J.E. into the backseat, positioned with her legs across the bench, she thrust a foot at Deputy Slater, touching her in the midriff as the deputy backed away. According to Deputy Slater's testimony at the jurisdictional hearing, J.E.'s foot "didn't impact my stomach forcefully because I was a far enough distance away."

The final chapter in the events on the day of J.E.'s detention, touched upon by the majority—properly so, because it is relevant to J.E.'s state of mind that day—occurred after Deputies Slater and Spangler drove J.E. back

1

to A.R.'s apartment, where A.R. expressed surprise that rather than simply bringing J.E. home, the deputies were taking her to jail or to juvenile hall. A few additional details are worthy of note here too.

While J.E. was still seated in the patrol car, the deputies allowed A.R. to speak to J.E. through the car window. At some point, J.E. said to the deputies, "I'm done. Can you please have mom leave." When the deputies instructed A.R. to back away from the car, she began yelling at J.E. During her tirade, according to Deputy Slater, she yelled, "I hope you die. I hope they beat your ass in there. I hope they never let you out." Upon being instructed again to move away, A.R. refused and "continued to yell obscenities. At that point, she yelled, 'F you, B' to Deputy Spangler."

The deputies then drove away, but before taking J.E. to the station for booking, they parked and spoke to her. According to Deputy Slater's testimony, "[J.E.] was very upset. She went from being angry at the situation to after all of the comments and things that happened with her mom, she started crying and was visibly upset. . . . We . . . spoke with [J.E.] and essentially told her that was awful what your mother just said to you. It was uncalled for. It shouldn't have happened."

Following J.E.'s detention, these wardship proceedings on a first petition under Welfare & Institutions Code section 602, subdivision (a), ensued.[1]

_____

[1] The Probation Department's Hearing Information Sheet/Initial Case Assessment, filed prior to the detention hearing, indicated, among other things, that J.E. is a "Runaway Risk" based on A.R.'s report that "she has left home without permission once previously and her whereabouts [were] unknown for approximately three days" and based on J.E.'s admission that she left "home without permission and while away from home she was under the influence of alcohol." The Hearing Information Sheet/Initial Case

2

## II. Analysis

A. *The Charged Offenses*

J.E.'s conduct upon being approached by Deputies Slater and Spangler, which included a profanity-laced refusal to cooperate and an attempt to spit at them, was nasty, rude, and disrespectful, but was it criminal?

Because " '[o]nly a slight unprivileged touching is needed to satisfy the force requirement of a criminal battery' " (*People v. Dealba* (2015) 242 Cal.App.4th 1142, 1149), J.E.'s "kick" to Deputy Slater would unquestionably be sufficient to uphold a Penal Code section 243, subdivision (b) conviction if J.E. were an adult. The same would be true for the Penal Code section 148, subdivision (a)(1) charge, since J.E.'s conduct in walking away from and then resisting these two deputies impeded them from carrying out their duties. (*In re Chase C.* (2015) 243 Cal.App.4th 107, 113.) Criminal battery and resisting a peace officer are general intent crimes, requiring only " 'an intent to perform an act of such a nature that the law declares its commission punishable as a criminal offense.' " (*People v. Rocha* (1971) 3 Cal.3d 893, 899.)

But we are not dealing with an adult. We have a 13-year-old here, and Penal Code section 26 presumes her to be incapable of committing a criminal offense unless the state establishes by clear and convincing proof that she knew the wrongfulness of her acts. For children under age 14, the issue of criminal capacity cuts below mens rea and is of more fundamental significance. Taking the clear and convincing burden into account, as we

---

Assessment also indicated that, for the then-current academic year at J.E.'s middle school, she had been "suspended for 4 days . . . and ha[d] accumulated 34 all-day unexcused absences."

must (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005–1012), I do not think the People met their Penal Code section 26 burden on this record.

B. *Penal Code Section 26*

" 'California . . . rebuttably presumes all minors under the age of 14 incapable of committing a crime, but does not totally exclude any child from criminal responsibility.' [Citations.] 'Section 26 stands to protect . . . young people . . . from the harsh strictures of [Welfare and Institutions Code] section 602.' " (*In re Paul C.* (1990) 221 Cal.App.3d 43, 50; see *In re Gladys R.* (1970) 1 Cal.3d 855, 867 (*Gladys R.*); *People v. Cottone* (2013) 57 Cal.4th 269, 281 ["presumption of incapacity operates to exempt the minor from legal responsibility"]; see generally Walkover, *The Infancy Defense in the New Juvenile Court* (1984) 31 UCLA L.Rev. 503.)

In evaluating whether the People rebutted the presumption of incapacity on this record, the juvenile court was entitled to infer appreciation of the wrongfulness of the charged conduct from J.E.'s "age, experience, and understanding" (*Gladys R.*, *supra*, 1 Cal.3d at p. 864); from any warnings or instructions given to her about the offending conduct on prior occasions (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298); and, since reliance on circumstantial proof is "inevitable" when "the issue is a state of mind" (*In re Tony C.* (1978) 21 Cal.3d 888, 900), from the "attendant circumstances of the crime." (*Ibid.*)

Because "it is only reasonable to expect that generally the older a child gets and the closer she approaches the age of 14, [and] the more likely it is that she appreciates the wrongfulness of her acts," a "child's age is a basic and important consideration." (*In re Cindy E.* (1978) 83 Cal.App.3d 393, 399.) Most of the cases invoking this precept, to be sure, involve very serious crimes. Of course, a child nearing age 14 can be expected to understand it is

4

wrong to commit murder (*In re Marven C.* (1995) 33 Cal.App.4th 482), rape (*In re Tony C., supra,* 21 Cal.3d 888), forced oral copulation (*In re Paul C., supra,* 221 Cal.App.3d 43), or conspiracy to burglarize cars (*In re Harold M.* (1978) 78 Cal.App.3d 380). That makes sense, since brutality and advance planning are circumstances that have obvious bearing on knowledge of wrongfulness.

But age alone cannot decide the question. Applying the Penal Code section 26 presumption is not like horseshoes, where close is good enough. If it sufficed to rebut the presumption that a minor is about to turn 14, the legislatively determined cut-off of age 14 would be meaningless. In my view—and as I read the majority's opinion, my colleagues do not disagree— some other factor must be present in addition to the child's age. (See, e.g., *In re Clyde H.* (1979) 92 Cal.App.3d 338, 344 ["past similar incidents of rock throwing where appellant ran away" at the appearance of his mother "suggest[ed] consciousness of guilt"]; *In re Jerry M., supra,* 59 Cal.App.4th at p. 298 [minor "was told and knew of the wrongfulness of his acts: his mother had told him it was wrong to touch girls in certain places, and he appeared to understand it was wrong to touch girls' breasts or attack other children"].)[2]

No such factor is present in this case.

C. *J.E.'s Lack of Experience with Law Enforcement Officers*

At issue in this case is a 13-year-old African-American child's first encounter with law enforcement. If the widespread public tumult of late over police violence in our country has taught anything, it is that many people in minority communities, particularly young people, live in fear of even routine

---

[2] See also, e.g., *In re Cindy E.*, *supra*, 83 Cal.App.3d at page 400 (fabrication of innocent motive, shifting blame on others, minimization of role in the offense); *In re Clyde H.*, *supra*, 92 Cal.App.3d at page 344 (apology for commission of offense).

interactions with law enforcement.  I point to this issue not because I think the deputies involved here did anything wrong—quite to the contrary, their treatment of J.E., especially when they realized she was the victim of abuse at the hands of A.R., was commendably sensitive—but because the only evidence in the record bearing on whether J.E. understood how to conduct herself in these circumstances was A.R.'s testimony that she never spoke to her about it.[3]

Rather than deal with this issue directly, the majority speaks generally of other sources of moral instruction, pointing out that J.E. was taught it was "wrong to disobey and physically assault authority figures" because she had been disciplined at school for being disrespectful and physically aggressive toward teachers.  And surely, the majority says, J.E.'s grandmother, with whom she lived for a number of years, taught her to discern "right from wrong."  But we are not talking about an encounter with "authority figures" in the generic sense.  Nor are platitudes about knowing "right from wrong" helpful here.[4]

---

[3] The Report and Recommendation of the Probation Department, filed after the charges against J.E. were sustained, and before the disposition hearing, summarizes an interview of J.E. in which she stated that her mother had, in fact, spoken to her about what to do in the event she was approached by police.  According to J.E., "she was told [by A.R.] not to answer questions asked by police . . . as she is a minor and it was within her rights."

[4] The apparent reason the majority finds it necessary to resort to generalizations about "authority figures" and discipline at school, and to speculate about things J.E.'s grandmother must have taught her, is the following testimony from A.R. on direct examination by the prosecutor: "Q: While she was living with you, and while you were raising her, did you ever talk to her about the difference between right and wrong?  A: I can't say I really did.  Q: Did you ever talk to her or teach her about hitting other people?  A: Yes, I told her to defend herself.  Q: And what about hitting others as the aggressor? . . . [¶]  Q: Did you talk to her about that?  A: I just told her

6

We must not look away from what actually happened here.  There are no classes in school that offer guidance on how to handle encounters with law enforcement.  These things are typically passed down by a parental figure who is wise enough to provide counsel on the subject.  Many parents of children of color, at some point in the course of child-rearing, find it necessary to provide their children self-protective advice to guide them in any future encounters with law enforcement.  One version of this advice, commonly known as "The Talk," emphasizes the importance of showing utmost courtesy and cooperation, willingness to comply with any directions given by an officer, and attentiveness to things that may not be obvious (certainly not to a child), like keeping his or her hands empty and in full view.[5]  There was no evidence before the juvenile court that J.E. had any guidance about this uniquely difficult set of issues.

Left to fend for herself, J.E. tried to walk away.  Her reaction in doing so was not entirely wrong, since in some circumstances any citizen (not just a minor) may simply "go on his way" when approached by the police (*People v. Souza* (1994) 9 Cal.4th 224, 234), but it was certainly wrong in the particular

---

to stand up for herself.  That's it.  Q: Did you ever tell her that it was wrong to initially hit somebody, not in defense but initially?  A: No. . . . [¶] Q: . . . [W]hen you were raising [J.E.] . . . did you ever talk to her about what good behavior is?  A: No.  Q: And did you ever talk to her about what bad behavior was?  A: No.  Q: Never?  A: No.  She's—she's been a good kid . . . .  Q: And when you say she was a good kid, did you teach her what those good behaviors were?  A: No.  She just did it herself."

This line of questioning, quite plainly designed to lay a foundation for Penal Code section 26 "knowledge of wrongfulness," obviously backfired, leaving a gap in the record on the issue.

[5] Young, *Deaths Shape How Black Parents Navigate the 'Talk'* (June 8, 2020) WebMD Health News <https://www.webmd.com/mental-health/news/20200608/deaths-shape-how-black-parents-navigate-the-talk> (as of September 3, 2020).

setting we have here. Unquestionably, these deputies were empowered to take J.E. into custody based on the information they had from A.R. and the citizen's arrest warrant she signed. The majority finds significance in J.E.'s understanding of what the deputies told her when they initially said she was not under "arrest," but we can hardly expect J.E. to have appreciated the Fourth Amendment nuances of her situation once the deputies changed their minds and handcuffed her.

In the absence of proof that A.R. was prepared for how to handle encounters with law enforcement, we are left to surmise about how a young person of J.E.'s age, of J.E.'s race, in J.E.'s community, may be expected to react when faced with a sudden show of law enforcement authority. There are some unstated assumptions behind the juvenile court's finding that J.E. knew it was wrongful to attempt to walk away from Deputies Slater and Spangler. The majority adopts those assumptions, declining to look behind them in the name of substantial evidence review. I see things differently. I would respectfully suggest that, from the perspective of someone in J.E.'s shoes (not the perspective of "most 13-year-old[]"), an effort to withdraw or flee is just as likely to be an act of panicked self-preservation as it is of knowing disobedience.

The nastiness that followed J.E.'s attempt to walk away from the deputies is hardly something to be condoned, but it is far from clear to me that any of it was criminal in the sense that must be shown for a child of this age. The only thing that does seem clear on this record is that, when all of the circumstances are taken into account, this 13-year-old, having made the decision to withdraw out of fear, had an emotional meltdown when she suddenly found herself in handcuffs, being frog-marched to a squad car.

D. *J.E.'s Reaction to Being Taken into Custody*

Looking at the initial interaction between J.E. and Deputies Slater and Spangler, the juvenile court observed that, once the deputies reassured J.E. they did not intend to arrest her and that all they wanted to do was talk to her about the altercation with her mother and take her home, it should have been evident to J.E. they were there to try to help her. Under the circumstances, the court concluded, J.E. must have understood it was wrong to "fight" with them. The majority concludes, similarly, that J.E. must have understood she was expected to obey and not defy these deputies, for, after all, they were in full uniform and they drove up in a marked patrol car.

But to prepare her for this specific situation, J.E.'s only teacher was her mother, who modelled physically and verbally confrontational conduct when under stress. When J.E.'s attempt to walk away did not work, she expressed her displeasure with all the extravagant drama of a scared 13-year-old, attempting to look "tough." While the sustained obnoxiousness that followed would strike anyone of ordinary sensibilities as offensive, I question my colleagues' use of the talismanic word "violent" to describe it, with all of the freight that word brings. The specific assaultive conduct we are addressing—and the conduct found to have violated Penal Code section 243, subdivision (b)—is J.E.'s "kick" to Deputy Slater's midriff area, which the deputy described as little more than a touch as she was backing away.

In my view, J.E. deserves a pass for this under Penal Code section 26. Most parents will recall what it is like to encounter a flailing foot, elbow or knee while subduing an emotionally distraught child whose actions are being governed by the manic sense of grievance we commonly call a tantrum. But few, I suspect, would describe the child's mental state in delivering such a blow—if the child was even aware it was a blow—as a deliberate effort to

commit a "violent" assault. I see no reason to treat this situation any differently. The only basis for concluding that J.E.'s "kick" to Deputy Slater was criminal, in my view, appears to be a determination to punish J.E. for crudely disrespecting these two deputies while in the throes of an emotional collapse.

We might say, I suppose, that "most 13-year-old[]" would know it was wrong to behave this way rather than submit quietly when dealing with law enforcement officers, but as the majority rightly acknowledges, a juvenile court must "consider the particular circumstances and perspective of the individual child before it, rather than to rely on generalizations about what children of a certain age should know." J.E. was still a child in the eyes of the law, and there is no evidence on this record she was streetwise or mature beyond her years. (*In re Harold M.*, *supra,* 78 Cal.App.3d at p. 385 ["evidence support[ed] an inference that [13-year-old] minor knew [auto burglary] . . . was condemned by law enforcement and court officers; that knowledge of the wrongfulness of the conduct was brought directly to his attention through police detention and court appearances; and that, far more effective than moral instruction by parent or teacher, such firsthand experiences had left their imprint on the minor's conscience"].)

### III. Conclusion

I concur in the majority's view that, when applying Penal Code section 26, juvenile courts must consider the individualized circumstances of the child before it, rather than rely on assumptions about the knowledge of wrongfulness a "normal" child her age would have. That principle, I think, takes a small step toward the elimination of unconscious bias in the juvenile justice system, since it prevents judges from calling upon their own presuppositions about expected behavior in children, whose cognitive ability

10

to self-regulate and make moral judgments, modern brain science now teaches us, develops at vastly different rates well into their teenage years.[6]

But in applying the criteria set out in the case law under Penal Code section 26, the majority opinion fails to apply the principle it enunciates. J.E.'s lack of experience in dealing with law enforcement and the absence of any evidence of conscious wrongdoing ought to be dispositive here. There is no evidence—none—that J.E. understood she could not walk away and refuse to cooperate when approached by Deputies Slater and Spangler, thereby violating Penal Code section 148, subdivision (a)(1). And given the objective evidence of her frenzied mental state at the time she was taken into custody, there is insufficient proof to support a Penal Code section 243, subdivision (b) violation.

In borderline cases, we should be guarded about over-criminalizing the juvenile justice system, particularly when presented with first petitions. I recognize we generally defer to a juvenile court's fact-finding, but I think the majority's application of the substantial evidence test on this record is insufficiently rigorous in light of the heightened standard of proof. (*Conservatorship of O.B.*, *supra,* 9 Cal.5th at pp. 1005–1012.) Under the circumstances presented, I fail to see how it can be said that the People met their burden of establishing by clear and convincing proof that J.E. should be stripped of her presumptive exemption "from the harsh strictures of [Welfare and Institutions Code] section 602." (*In re Paul C., supra,* 221 Cal.App.3d at p. 50.)

---

[6] See Henning, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform* (2013) 98 Cornell L.Rev. 383, 397–401, 419–424.

Stepping back and considering this case from a broader perspective, we would do well to remember a key distinction drawn fifty years ago in *Gladys R.*, which remains the lodestar opinion construing Penal Code section 26. If a juvenile court must intervene in a child's life, a wardship may be declared under Welfare and Institutions Code section 601, for status offenses, as well as under section 602, for criminal offenses. (See Welf. & Inst. Code, § 601, subd. (a) [persistent or habitual refusal to obey directions of parent, guardian or custodian], *id.*, subd. (b) [truancy or persistent or habitual refusal to obey directions of school authorities]; § 602 [commission of acts which, if committed by an adult, would be crimes].) "Strictly speaking, '[a]n adjudication under section 601 neither requires nor implies a finding of 'delinquency.' " (*In re W.B.* (2012) 55 Cal.4th 30, 42.)

Central to the *Gladys R.* holding is a recognition that the line drawn by Penal Code section 26 does "not lie at the periphery of the statutory scheme" governing juvenile justice in California. (*Gladys R., supra,* 1 Cal.3d at p. 863.) Justice Tobriner's opinion for the *Gladys R.* court is very clear that, to protect children from the grave consequences of wardship under Welfare and Institutions Code section 602, with all of the stigma and potentially negative consequences for a child's life that it brings, Penal Code section 26 stands as a bulwark between sections 601 and 602 of the Welfare and Institutions Code. (*Gladys R., supra,* at pp. 864–867.) Indeed, he points out it is "practically the only special provision for children in the entire legal system." (*Id.* at p. 863.) Cases like this one, I am sorry to say, dilute it into nonexistence.

_____

STREETER, J.

12

Trial Court:                    Contra Costa County Superior Court

Trial Judge:                    Hon. John C. Cope

Counsel for Appellant:          Law Office of Erin Keefe, Erin W. Keefe, by
                                Appointment of the Court of Appeal under the
                                First District Appellate Project Assisted Case
                                System

Counsel for Respondents:        Xavier Becerra, Attorney General; Lance E.
                                Winters, Chief Assistant Attorney General;
                                Jeffrey M. Laurence, Senior Assistant Attorney
                                General; Masha Dabiza, Deputy Attorney
                                General

*People v. J.E.* (A156839)

13

Court of Appeal, First Appellate District, Division Four - No. A156839

**S265077**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

In re J.E., a Person Coming Under the Juvenile Court Law.
_____

THE PEOPLE, Plaintiff and Respondent,

v.

J.E., Defendant and Appellant.

_____

The petition for review is denied.

Liu and Cuéllar, JJ., are of the opinion the petition should be granted.


_____/s/_____
*Chief Justice*

IN RE J.E.
S265077


Dissenting Statement by Justice Liu


Under Penal Code section 26, a child under the age of 14 is presumed to be incapable of committing a crime. To overcome this presumption, there must be clear and convincing evidence that the child knew the wrongfulness of the act committed. (*In re Manuel* (1994) 7 Cal.4th 229, 232.) This heightened standard of proof serves to narrow the gateway into the juvenile justice system, an inauspicious path that "significantly increases [a child's] likelihood of dropping out of school and entering the criminal justice system." (*In re A.N.* (2020) 9 Cal.5th 343, 365 (conc. opn. of Liu, J.).) Because the record in this case does not appear to contain substantial evidence that satisfies the "high probability demanded by [the clear and convincing] standard of proof" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005), I would grant review.

On January 27, 2019, A.R. called the police after an altercation with her 13-year-old daughter, J.E. The two sheriff's deputies who responded to the call spotted J.E. walking down the street and told J.E. they needed to escort her home to speak with her mother. J.E. refused and attempted to walk away. The deputies grabbed J.E.'s arms, at which point J.E. twisted, turned, flailed her legs, and ultimately kicked a deputy in the stomach.

After placing J.E. in the patrol car, the deputies drove to A.R.'s apartment and allowed her to approach the vehicle to speak with J.E. At some point, J.E. said to the deputies, "I'm

done.  Can you please have my mom leave."  A.R. then yelled at J.E., "I hope you die.  I hope they beat your ass in there.  I hope they never let you out."  When the deputies instructed A.R. to move away from the car, she refused and "continued to yell obscenities.  At that point, she yelled, 'F you, B' to Deputy Spangler."  The deputies then drove away.

On January 29, 2020, the Attorney General filed a juvenile wardship petition alleging that J.E. committed misdemeanor battery upon a peace officer and misdemeanor resisting, obstructing, or delaying a peace officer.  J.E. moved to dismiss the wardship petition, arguing that the prosecutor failed to establish that J.E. had the requisite capacity to commit the alleged crimes.  The court denied the motion and sustained the wardship petition.  The Court of Appeal affirmed the juvenile court's finding that J.E. knew her conduct was wrongful, explaining that her behavior was "conduct that, whether it is aimed at a peace officer or anyone else, most 13-year-olds know is wrong."  (*In re J.E.* (2020) 54 Cal.App.5th 309, 314.)  The court also opined that "J.E. was in eighth grade at the time of the incident, and part of going to school is learning to respect other people, including teachers and other authority figures."  (*Id.* at p. 315.)

In many circumstances, it is reasonable for judges to rely on experience and commonsense assessments like those made by the Court of Appeal.  But "common sense" cuts more than one way in this context.  (*Miller v. Alabama* (2012) 567 U.S. 460, 471; see *ibid.* [children have "diminished culpability" because of their lack of maturity, underdeveloped sense of responsibility, impulsivity, and susceptibility to peer pressure, as " 'any parent knows' "].)  Further, it is important to focus on the record

2

evidence in this case before lumping J.E. together with "most 13-year-olds."

J.E., barely a teenager, had no previous encounters with law enforcement officers and lived with a mother who modeled physically and verbally confrontational behavior when under stress. A.R. taught J.E. to "stand up for herself" and "defend herself." The only evidence in the record bearing on whether J.E. understood how to conduct herself during encounters with the police was A.R.'s testimony that she never spoke with J.E. about "how to interact with police officers," "respecting of police officers' commands or authority," or "stopping when a police officer told her to."

Moreover, J.E. experienced this interaction with law enforcement as an African American. If we are to take notice of what "most 13-year-olds know," then we should also take notice of the social reality that interactions between the police and Black youth are often fraught with distrust and risk of violence. As Justice Streeter observed, "If the widespread public tumult of late over police violence in our country has taught anything, it is that many people in minority communities, particularly young people, live in fear of even routine interactions with law enforcement." (*In re J.E.*, *supra*, 54 Cal.App.5th at p. 320 (conc. & dis. opn. of Streeter, J.).) When the two deputies grabbed J.E.'s arms, she may well have thought that the deputies were trying to harm her.

The record before the juvenile court appears to contain nothing close to clear and convincing evidence that J.E. understood the wrongfulness of her conduct. To the contrary, the evidence of her troubled relationship with her mother strongly indicates that J.E. did not learn right from wrong at

home.   (See *Miller v. Alabama*, *supra*, 567 U.S. at p. 471 ["children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers"].) However obvious it may seem to "most 13-year-olds" that kicking a police officer is wrongful conduct, the controlling legal inquiry requires us to step into J.E.'s shoes and "consider the particular circumstances and perspective of the individual child before [us], rather than [relying] on generalizations about what children of a certain age should know."  (*In re J.E.*, *supra*, 54 Cal.App.5th at pp. 314–315.)

The Court of Appeal emphasized that J.E. "was less than a month from her fourteenth birthday."  (*In re J.E.*, *supra*, 54 Cal.App.5th at p. 314.)  But the Legislature has determined that the "harsh strictures" of a delinquency adjudication may apply "only to those who are over 14 and may be presumed to understand the wrongfulness of their acts and to those under the age of 14 who clearly appreciate the wrongfulness of their conduct."  (*In re Gladys R.* (1970) 1 Cal.3d 855, 867; see *id.* at p. 864 ["[Penal Code] section 26 provides the kind of fundamental protection to children charged under [Welfare and Institutions Code] section 602 which this court should not lightly discard."].)  The Legislature, having drawn a line at age 14, has already decided the import of a child's age in the analysis.  To give independent weight to the fact that J.E. was almost 14 is in tension with the Legislature's determination.

I am doubtful that the Court of Appeal reached the correct conclusion in this case.  That in itself is not typically a reason for granting review.  But the court's analysis appears to misapply our recently established standard for reviewing questions of clear and convincing proof.  (*Conservatorship of*

*O.B., supra*, 9 Cal.5th at p. 1005.)  And the potential consequences to J.E. of entering the juvenile justice system are significant.  (See Petrosino et al., Formal System Processing of Juveniles: Effects on Delinquency (2010) p. 36 [reviewing 29 controlled trials and finding that juvenile court intervention increases the severity and frequency of subsequent delinquency, especially compared to diversionary alternatives].)  For these reasons, I would grant review.

**LIU, J.**

**I Concur:**

**CUÉLLAR, J.**